**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

DEBRA DARLENE PRUITT,

      Plaintiff,

v.                                                    Civil No. 04-CV-10358-BC

COMMISSIONER OF                    DISTRICT JUDGE DAVID M. LAWSON
SOCIAL SECURITY,                      MAGISTRATE JUDGE CHARLES BINDER

      Defendant.

_____/


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


**I.     RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, IT IS RECOMMENDED that PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE DENIED, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED, and that the FINDINGS OF THE COMMISSIONER BE AFFIRMED.


**II.    REPORT**

    **A.     Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case has been referred to this Magistrate Judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and disability

insurance benefits.  This matter is currently before the Court on Defendant's motion for summary judgment and Plaintiff's response.

Plaintiff was 48 years of age at the time of the most recent administrative hearing and has completed a high school education.  (Tr. at 419.)  Plaintiff's relevant work history included three years work for a plastics company as a machine operator, inspector, and doing janitorial work, and waitressing and bartending work for a country club and two different bars.  (Tr. at 422-23.)

Plaintiff filed her first claim for benefits on March 22, 1996, alleging that she became unable to work on July 28, 1994.  (Tr. at 51-53.)  This claim was denied initially and upon reconsideration.  (Tr. at 28 & 30.)  In denying Plaintiff's claim, the Defendant Commissioner considered mild herniated disc and pain syndrome as possible bases of disability.  (*Id.*)

On February 11, 1998, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) William J. Musseman, who considered the case *de novo*.  In a decision dated March 25, 1998, the ALJ found that Plaintiff was not disabled.  (Tr. at 9-21.)  Plaintiff requested a review of this decision on May 22, 1998.  (Tr. at 7-8.)

The ALJ's decision became the final decision of the Commissioner on January 21, 2000, when the Appeals Council denied Plaintiff's request for review.  (Tr. at 5-6.)  Plaintiff filed suit in U.S. District Court (Case No. 00-CV-71495-DT), and on August 31, 2000, Judge Paul Borman signed an order granting a joint stipulation to remand the case for further administrative proceedings.  (Tr. at 492-93.)

On June 19, 2000, while her case was on remand, Plaintiff filed a second application for disability benefits, alleging that she became unable to work on March 26, 1998.  (Tr. at 621-23.)  This claim was denied at the initial stage.  (Tr. at 610.)  In denying Plaintiff's claim, the Defendant Commissioner considered chronic pain and affective disorders as possible bases of disability.  (*Id.*)

2

On March 16, 2001, Plaintiff appeared with different counsel before ALJ Musseman, who considered the case *de novo*. In a decision dated April 30, 2001, the ALJ found that Plaintiff was not disabled. (Tr. at 461-71.) Plaintiff requested a review of this decision on June 18, 2001. (Tr. at 456-57.)

The ALJ's decision became the final decision of the Commissioner on October 26, 2004, when the Appeals Council stated that "based on the applications filed on March 22, 1996 and June 19, 2000, the claimant is not entitled to a period of disability or disability insurance benefits. . . ." (Tr. at 450.) On December 17, 2004, Plaintiff filed the instant suit again seeking judicial review of the Commissioner's unfavorable decision.

### B.    Standard of Review

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam). The Commissioner is charged with finding the facts relevant to an application for disability benefits. A federal court "may not try the case de novo, . . . ." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984).

If supported by substantial evidence, the Commissioner's decision is conclusive, regardless of whether the court would resolve disputed issues of fact differently, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir.1990), and even if substantial evidence would also have supported a finding other than that made by the ALJ. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). The scope of the court's review is limited to an examination of the record

3

only. *Brainard,* 889 F.2d at 681. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 681 (citing *Consolidated Edison Co. v. NLFB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216, 83 L. Ed. 2d 126 (1938)). The substantial evidence standard "'presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference from the courts.'" *Mullen*, 800 F.2d at 545 (quoting *Baker v. Heckler*, 730 F.2d 1147, 1149 (8th Cir. 1984)) (affirming the ALJ's decision to deny benefits because, despite ambiguity in the record, substantial evidence supported the ALJ's conclusion).

The administrative law judge, upon whom the Commissioner and the reviewing court rely for fact finding, need not respond in his or her decision to every item raised, but need only write to support his or her decision. *Newton v. Sec'y of Health & Human Servs.*, No. 91-6474, 1992 WL 162557 (6th Cir. July 13, 1992). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("a written evaluation of every piece of testimony and submitted evidence is not required"); *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987) (ALJ need only articulate his rationale sufficiently to allow meaningful review). Significantly, under this standard, a reviewing court is not to resolve conflicts in the evidence and may not decide questions of credibility. *Garner,* 745 F.2d at 387-88.

## C.     Governing Law

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990).   The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen*, 800 F.2d at 537.

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994).  "[B]enefits are available only to those individuals who can establish 'disability' within the terms of the Social Security Act." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  One is thus under a disability "only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

A claimant must meet all five parts of the test set forth in 20 C.F.R. § 404.1520 in order to receive disability benefits from Social Security.  The test is as follows:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments, benefits are denied without further analysis.

Step Three:  If the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled without further analysis.

Step Four:  If the claimant is able to perform his or her previous work, benefits are denied without further analysis.

Step Five:  If the claimant is able to perform other work in the national economy, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920.  *See also Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 554 n.2 (6th Cir. 1995); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 687-88 (6th Cir. 1985).  "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled."  *Preslar*, 14 F.3d at 1110.  "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]."  *Id.*  "Step five requires the [Commissioner] to show that the claimant is able to do other work available in the national economy. . . ."  *Id.*

**D.      Administrative Record**[1]

A review of the medical evidence contained in the administrative record and presented to the ALJ indicates that Plaintiff's medical problems apparently began in 1992 when she noticed mild aching in her neck.  The pain increased in mid-January 1992 while she was working on a production line at Superior Plastics, and the pain began to travel down her right shoulder and arm.

---

[1]Much of the relevant medical evidence is repeated at more than one point in the 872 page administrative record.

The pain continued to increase, and in mid-February an EMG showed a right C5 radiculopathy.[2] In March she was examined by Dr. Harold Portnoy, M.D., a neurologist.  He noted limitation of motion in her neck, pain in her right shoulder and arm, marked weakness of abduction of her right shoulder, and some deltoid and bicep weakness.  (Tr. at 131.)  Dr. Portnoy felt that Plaintiff had a ruptured disc at the C4 level on the right and ordered a myelogram which in fact showed that the disc was ruptured.  (Tr. at 132, 134.)  Plaintiff underwent surgery in May of 1992, however, she continued treatment for her pain and discomfort for the next several years.  Plaintiff also had a hysterectomy in 1997.

On October 16, 1997, Plaintiff was seen at the Hillside Center by Diana Redman, a medical social worker.  Plaintiff stated that she was in chronic pain and felt that she was depressed.  Ms. Redman found Plaintiff to be spontaneous, logical and relevant in her responses, but depressed and discontented, tearful, anxious, and angry.  (Tr. at 817.)  She felt that Plaintiff was preoccupied and had a poor self-concept, "possibly due to her physical injuries."  (*Id*.)  She diagnosed severe depression, along with chronic thoracic strain.  (Tr. at 818.)  Thereafter, Plaintiff continued to see Ms. Redman or Dr. Jyothi Nutakki.  By early July 1998, Plaintiff reported to Dr. Nutakki that a combination of medications "seems to be working very well for her."  (Tr. at 810.)  Similar findings were reported by Dr. Nutakki in October and November 1998.  (*Id*.)  The two most recent notations in Plaintiff's medical records indicate that Plaintiff called to cancel scheduled appointments.  (Tr. at 809-10.)

---

[2]Radiculopathy is defined as "a disease or abnormality of a dorsal or ventral (sensory or motor) spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the point where it joins its companion root (a motor or a sensory) to form a spinal nerve."  5 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE R-10.

On May 11, 2000, Plaintiff was seen by Dr. Rosario Villareal, M.D., for generalized joint pain. She stated that her back pain was radiating down the leg and that she had pins and needles sensation in the plantar area. Plaintiff also reported having memory loss. (Tr. at 554.) The doctor reported that Plaintiff's range of motion in the back was "free and normal." Straight leg raising tests and reflex testing were normal. (*Id*.) The doctor's impressions were generalized osteoarthritis, hyperlipidemia,[3] chronic cephalgia,[4] chronic neck pain, and menopause. (Tr. at 554.) On May 24, 2000, Dr. Villareal reported that Plaintiff's hand grip was normal, and that range of motion in her back was again normal. (Tr. at 747.) Electromyographic studies conducted June 8, 2000, at the request of Dr. Villareal, revealed no evidence of abnormalities. (Tr. at 562.) An x-ray of the spine showed an essentially normal thoracic spine, although degenerative changes were seen in the lumbar spine, most prominent at L1-L2 and L2-L3. (Tr. at 563.) On June 26, 2000, Dr. Villareal reported that plaintiff had tenderness in the right arm, but that she exhibited normal range of motion in the neck. (Tr. 837). On August 1, 2000, Plaintiff was seen again by Dr. Villareal for depression and anxiety. The doctor reported that Plaintiff had stopped taking a previously prescribed antidepressant and had discontinued psychotherapy. The doctor suggested that Plaintiff refer herself to Community Mental Health for assistance, and he put her on a different antidepressant with instructions not to discontinue the medication. (Tr. at 566.)

Plaintiff was seen by Dr. Gordon Forrer on August 8, 2000, at the request of the Disability Determination Service for a psychiatric evaluation. Plaintiff reported to the doctor that her social life, which revolved around contact with her family, was satisfying. (Tr. at 568.) Plaintiff reported

---

[3]Hyperlipidemia is defined as "the presence of high levels or concentration of lipids (fats) in the blood." 3 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE H-219.

[4]Cephalgia is defined as "a pain in the head; the common headache." 1 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE C-150.

that she possessed a drivers license.  (Tr. at 569.)  She reported that many common household chores were accomplished by her husband and her daughter.  She stated that she shopped for food and necessities from time to time and sometimes cooked.  Plaintiff reported that she spent her days watching T.V. and talking with members of her family.  The doctor reported that Plaintiff showed no outward signs of pain, anxiety, or discomfort.  Plaintiff was characterized as pleasant and agreeable, and her responses were of "good quality" and "empathetic."  (*Id*.)  Dr. Forrer assessed Plaintiff's mood as one of cheerfulness without irritability or hostility.  Plaintiff was cooperative and appeared not to be evasive or suspicious.  (*Id*.)  The doctor found no evidence of hallucinations or delusions.  Plaintiff's affect displayed "adequate range of motility," and was "appropriate to the content of her thought and circumstances[.]"  When asked if she would accept work consistent with her physical limitations, Dr. Forrer reported that she responded, "Oh yes, in a second."  (Tr. at 571.)  The doctor found no diagnosable psychiatric disorder.  Dr. Forrer concluded that Plaintiff "possesses the psychological capable [sic] to work 40 hours a week with adequate pacing and concentration without interruption from psychiatric symptomatology."  Her GAF[5] was "psychologically adequate."  (Tr. at 571.)

Plaintiff underwent a physical exam conducted at the request of the Disability Determination Service by Dr. Dara Headrick on August 14, 2000.  Examination revealed pain when asked to perform certain tasks.  However, Plaintiff was able to get up from the examining table and walk, walk on heels and toes with some pain in the ankle, and tandem walk without difficulty or loss of balance.  Examination of the extremities showed no joint effusions, no

---

[5]"Axis V is for reporting the clinician's judgment of the individual's overall level of functioning.  This information is useful in planning treatment and measuring its impact and in predicting outcome.  The reporting of overall [psychological, social, and occupational] functioning on Axis V can be done using the Global Assessment of Functioning (GAF) Scale."  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000).

peripheral edema, and no muscular atrophy.  Examination of the back showed no evidence of scoliosis, and Plaintiff was able to bend forward to 80 degrees of the normal 90 degrees, although with some complaints of pain.  There was tenderness with palpation in the cervical, thoracic and lumbar areas.  (Tr. at 574.)  Plaintiff demonstrated cervical range of motion to 40 degrees of flexion, 45 degrees of extension, 30 degrees of right lateral flexion, 45 degrees of left lateral flexion, and 45 degrees of right and left rotation.  Dorsolumbar spine extension was accomplished to 30 degrees.  Shoulder range of motion was full, as was elbow, wrist and finger range.  Strength testing was also rated as "good."  Dr. Headrick found no objective findings of neurologic impairment.  She concluded that "there is no significant impairment noted that should make her incapable of performing some type of work-related activity."  (Tr. at 575.)

On September 15, 2000, Plaintiff returned to Dr. Villareal complaining of low back pain.  The range of motion in Plaintiff's neck was found to be normal, as was the range of motion in Plaintiff's arms.  Range of motion in Plaintiff's back was limited, and the doctor detected paravertebral muscle spasms.  Straight leg raising tests were positive.  The doctor adjusted Plaintiff's pain medications.  (Tr. at 841.)

On September 25, 2000, Plaintiff underwent an MRI of her lumbar spine, conducted at the request of Dr. Villareal.  (Tr. at 842.)  The reviewing physician found some misalignment of the lumbar spine but no disc herniation or stenosis of the central spinal canal.  The reviewing physician also found that the exit points for the peripheral nerves leading from the spinal cord were normal and that the spinal cord ended in a normal fashion.  (*Id.*)

On October 9, 2000, Plaintiff returned to Dr. Villareal.  The doctor again reported that range of motion in the neck, arms and shoulders showed no limitations.  The doctor found spasms in the paravertebral back muscles which limited her range of motion.  The doctor adjusted Plaintiff's

medications.  (Tr. at 843.)  Approximately one month later, Plaintiff saw the doctor for a sinus infection.  (Tr. at 844.)

On March 1, 2001, Dr. Villareal completed a "medical assessment of ability to do work-related activities (physical).  The doctor found that Plaintiff could occasionally lift up to ten pounds and frequently lift up to five pounds.  (Tr. at 607.)  The doctor noted that Plaintiff could stand and walk for up to two hours during an eight hour day, stand without interruptions for up to one hour, sit for up to two hours during an eight hour work day, and sit without interruption for an hour at a time.  (Tr. at 607-08.)  The doctor felt that Plaintiff could occasionally stoop but should not be required to climb, balance, crouch or crawl.  The doctor felt that Plaintiff's abilities to see, hear, speak and feel were unimpaired, but that Plaintiff's ability to reach, finger, and push or pull were effected by her physical limitations.  (*Id*.)

In early April 2001, a psychiatrist completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)."   On this form the psychiatrist assessed that Plaintiff had a fair ability to remember locations and work-like procedures, understand, remember and carry out short instructions, but a poor ability to complete a full work day or perform at a consistent pace. (Tr. at 822.)  The psychiatrist stated that Plaintiff had a good ability to interact with the public, respond to simple questions, adhere to basic standards of cleanliness, respond appropriately to changes in work setting, and be aware of normal hazards.  (Tr. at 823.)  Plaintiff possessed a fair ability to accept instructions and respond to criticism from supervisors, get along with co-workers, and maintain socially appropriate behavior.  (Tr. at 822.)

At the most recent administrative hearing, conducted March 16, 2001, a vocational expert (VE) testified.  She characterized Plaintiff's prior work adopting a vocational analysis completed

shortly before the hearing.  Plaintiff's prior work was characterized as light to medium in exertion and unskilled.  (Tr. at 513.)

### E.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since the onset of disability.  (Tr. at 467.)   At step two, the ALJ found that Plaintiff's back and neck pain was "severe" within the meaning of the second sequential step.  (*Id.*)   At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations.  (*Id.*)  At step four, the ALJ found that Plaintiff could not perform her past relevant work .  (Tr. at 468.)  At step five, the ALJ denied Plaintiff benefits because Plaintiff could perform a significant number of jobs available in the national economy.  (*Id.*)  Using the Commissioner's grid rules as a guide, the ALJ found that "there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as a security monitor, order clerk, reception clerk and timekeeper."  (*Id.*)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that Plaintiff possessed the residual functional capacity to return to a significant range of sedentary work.  (Tr. at 468.)

> Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a) (1991).  Social Security Ruling (SSR) 83-10 clarifies this definition and provides that:

"Occasionally" means occurring from very little up to one-third of the time.  Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.  Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim.  I turn next to the consideration of whether or not substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

In his response to Defendant's motion for summary judgment, counsel for Plaintiff argues that substantial evidence fails to support the findings of the Commissioner.  In this circuit, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Mullen,* 800 F.2d at 545.  In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

I note initially that in his most recent decision, the ALJ concluded that Plaintiff's insured status expired December 31, 1999.  (Tr. at 467.)  In order to be eligible for disability benefits, a person must become disabled during the period in which he or she met the statutory special earnings requirements.  42 U.S.C. §§ 416(I), 423(c)(1)(B)(I).  Thus, the medical evidence relevant to the issue of disability is that medical evidence dealing with the claimant's condition during the period of his or her insured status.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  However, in *Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir. 1976), the court held that "Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to

establish the existence of the same condition at the preceding time."  Directly on point, the Sixth Circuit held in *Higgs*, 880 F.2d at 863, that the Commissioner must consider medical evidence of a claimant's condition after his date last insured to the extent that the evidence is relevant to the claimant's condition prior to the date last insured.  In this case, the ALJ did consider subsequent medical evidence in order to determine the nature and extent of Plaintiff's impairments prior to the date she was last insured, as has this judicial officer.

The main thrust of Plaintiff's response to Defendant's motion for summary judgment is that the ALJ improperly rejected the findings of a psychiatric examination conducted by Dr. R. E. Fuller, M.D., in April 1997, and of a state agency examiner.  (Tr. at 104-114, 326-30.)  Counsel argues that the ALJ improperly discounted findings of severe mental distress and significant impairments in the ability to perform calculations, as well as the doctor's characterization of Plaintiff as possessing "poor coping" skills.  (Tr. at 329.)  Counsel for Plaintiff characterizes Dr. Fuller as a treating source, which, under the governing regulations, preclude an ALJ from this evidence without good reasons.  According to counsel for Plaintiff, the ALJ did not consider the severity of limitations stated by Dr. Fuller, but instead substituted his own judgment for that of a qualified psychiatrist.  (Pl.'s Mot., Dkt. 16 at 4.)

The Commissioner has promulgated a special technique to ensure that all evidence needed for the evaluation of such a claim is obtained and evaluated.  This technique was designed to work in conjunction with the sequential evaluation process set out for the evaluation of physical impairments.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  Congress laid the foundation for making disability determinations when mental impairments are involved in 42 U.S.C. § 421(h), which provides:

An initial determination under subsection (a), (c), (g), or (I) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

20 C.F.R. § 404.1520a explains in detail the special procedure, and requires the completion of "a standard document outlining the steps of this procedure." 20 C.F.R. § 404.1520a(d). The regulation further requires the standard document to be completed and signed by a medical consultant at the initial and reconsideration levels, but provides other options at the administrative law judge hearing level. *Id*. Under this procedure, the Commissioner must first make clinical findings, (i.e. the "A" criteria), as to whether the claimant has a medically determinable mental disorder specified in one of eight diagnostic categories defined in the regulations. *See* 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 12.00A. Then the Commissioner must measure the severity of any mental disorder; that is, its impact on the applicant's ability to work. This is assessed in terms of a prescribed list of functional restrictions associated with mental disorders, (i.e. the "B" criteria).

The "B" criteria identify four areas which are considered essential to the ability to work. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C. The first area is "activities of daily living." This area requires the Commissioner to determine the claimant's ability to clean, shop, cook, take public transportation, maintain a residence and pay bills. (*Id*.). Under the second criterion, "social functioning," the Commissioner must determine whether the claimant can interact appropriately and communicate effectively and clearly with others. (*Id*.). The third function, "concentration, persistence and pace," refers to the claimant's ability to sustain focused attention sufficiently long enough to permit the timely completion of tasks found in work settings. (*Id*.). The final area, that

15

of "deterioration or decompensation in work or work-like settings," refers to the claimant's ability to tolerate increased mental demands associated with competitive work. (*Id.*).

If the first two "B" criteria receive ratings of "none" or "slight," the third a rating of "never" or "seldom," and the fourth a rating of "never," the Commissioner will conclude that the mental impairment is not severe, and therefore cannot serve as the basis for a finding of disability. 20 C.F.R. §§ 404.1520a(c)(1) and 404.1521. If, on the other hand, the "B" criteria indicate that the mental impairment is severe, the Commissioner must then decide whether it meets or equals a listed mental disorder. 20 C.F.R. § 1520a(c)(2). The Commissioner will determine that the claimant is disabled if the mental impairment is a listed mental disorder and at least two of the "B" criteria have been met. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02, *et. seq.* If the severe mental impairment does not meet a listed mental disorder, the Commissioner must perform a residual functional capacity assessment to determine whether the claimant can perform some jobs notwithstanding his mental impairment. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The findings of a psychologist are relevant in establishing the existence and severity of a mental impairment, and a psychologist's evaluation of the disabling nature of a mental impairment need not be given less weight than that of a psychiatrist. *Crum v. Sullivan*, 921 F.2d 642 (6th Cir. 1990).

In this case, as to the "A" criteria, the ALJ found the presence of a medically documented "affective disorder," (20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04), but no other mental disorders. (*See* Tr. at 464.) Turning to the "B" criteria, the ALJ found that Plaintiff's mental impairment led to no restrictions in daily living, mild difficulties in maintaining social function, and no difficulties in maintaining concentration, persistence, or pace. The ALJ found no evidence of decompensation in work-like settings. (Tr. at 464.) Based on these findings, the ALJ concluded that Plaintiff's

16

mental impairment was not "severe," that is, it does not "significantly limit [plaintiff's] physical or mental ability to do basic work activities." *See also* 20 C.F.R. §§ 1520a(c), 404.1521(a).

In order to find a "marked" limitation in daily activities, or a "marked" difficulty in maintaining social functioning, a plaintiff must show that the mental impairment "seriously interfere[s] with the ability to function independently, appropriately and affectively." *Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988). In *Foster*, 853 F.2d at 488, Plaintiff was diagnosed with a dysthymic disorder and depressed mood. The denial of Plaintiff's claim for disability was upheld based on Plaintiff's testimony that she was able to cook, wash dishes, and do her laundry.

In *Vaughn v. Sec'y of Health & Human Servs.*, No. 89-2259, 1990 WL 120967 (6th Cir. Mich., August 21, 1990), the denial of plaintiff's claim for benefits, based at least in part on mental impairments, was upheld where the record showed that although plaintiff had very low self-esteem and some mental retardation, he was nonetheless generally logical, cooperative, oriented, and capable of engaging in logical and abstract thought.

In *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 150 (6th Cir. 1990), the denial of plaintiff's claim for disability benefits based on mental impairments was upheld where the record showed that Plaintiff washed dishes, cooked, shopped, read, watched television, and drove.

In *Hogg v. Sullivan*, 987 F.2d 328, 333 (6th Cir. 1992), plaintiff was treated for depression and argued that this condition served as a proper basis for a finding of disability. The denial of this claim was upheld as the record indicated that plaintiff was able to care for herself and her son, maintain a regular schedule of daily activities, attend church, undertake vocational training, visit relatives, and drive.

In *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260 (6th Cir. 1988), the ALJ found that plaintiff's condition met both the A and B criteria of Listed Impairment 12.04. At issue was

the date of disability.  In that case, there was testimony that plaintiff's wife had to assist him in bathing and putting on his clothes.  The plaintiff twice tried to commit suicide, and plaintiff did nothing but lie in bed and watch television.  *Cornette*, 869 F.2d at 264.

In *Lankford v. Sullivan*, 942 F.2d 301 (6th Cir. 1991), the court reversed a finding of nondisability and held that plaintiff there met both the A and B criteria of Listed Mental Impairment 12.08.  In *Lankford*, there was abundant evidence of repeated suicide attempts, violent behavior and repeated lengthy hospitalizations for treatment of mental disorders

The facts of this case, I suggest, are much closer to those of *Foster, Young, Vaughn,* and *Hogg.*   *Cornette* and *Lankford*, on the other hand, stand in considerable contrast to the instant case.  There is in this record no indication that mental impairments rendered Plaintiff with "no useful ability to follow work rules, deal with the public, interact with supervisors, cope with work stress or relate predictably in social situations[,]" as was the case in *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1068 (6th Cir. 1992).  The ALJ's findings are also consistent with the opinions of Dr. Forrer, rendered less than nine months after the expiration of Plaintiff's insured status.

After review of the record, I further suggest that counsel's argument is devoid of merit and mischaracterizes the nature of Dr. Fuller's opinions.  While counsel is correct that the opinions of treating sources are to be accorded greater weight, *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1370, n.7 (6th Cir. 1991), both the context and the content of Dr. Fuller's report make clear that he is in fact not a treating source, but rather a consultative physician hired by the Commissioner, who only saw Plaintiff once.  (Tr. at 326, 330, 336).  Dr. Fuller's status as a consultative examiner is further confirmed by a handwritten notation made at the bottom of the report's first page, apparently by an employee of the Commissioner.  (*See* Tr. at 326.)

18

Moreover, even if Dr. Fuller were a treating psychiatrist, substantial evidence supports the ALJ's rejection of his findings and opinions. Dr. Fuller's examination was conducted prior to the psychiatric treatment Plaintiff underwent at the Hillside Center. This treatment not only post-dates Dr. Fuller's examination, but is more nearly contemporaneous with the expiration of Plaintiff's insured status. As noted previously, from July through November 1998, Dr. Nutakki consistently reported that medications brought about considerable improvement, and Plaintiff reported on more than one occasion that she was "doing very well." (Tr. at 810.) Furthermore, the last two notations made by Dr. Nutakki indicate that Plaintiff called cancelling appointments. In light of the consistent reports of improvement by Dr. Nutakki, I suggest that the ALJ was not unjustified in concluding as he did with regard to Plaintiff's mental impairments. As to the state examiner's results, even if the ALJ had agreed with the findings, he would not have found Plaintiff disabled based upon mental impairments. (Tr. at 111).

I further suggest that substantial evidence supports the ALJ's findings as to Plaintiff's physical impairments. The findings of Dr. Villareal, closest to the expiration of Plaintiff's insured status, indicate normal range of motion in the back and neck, good grip strength, and negative straight leg raising test results. (Tr. at 554). Electromyographic testing conducted within six months of the expiration of Plaintiff's insured status revealed no evidence of abnormalities. (Tr. at 562.) Although Dr. Villareal later found the range of motion in Plaintiff's back to be impaired, he consistently noted that Plaintiff had normal range of motion in the neck and arms. (Tr. at 740, 747, 837, 841.) X-rays of Plaintiff's spine, although showing degenerative changes, did not reveal disc herniation and showed an essentially normal thoracic spine. (Tr. at 563.) MRI imaging of Plaintiff's spine, taken nine months after the expiration of Plaintiff's insured status, while showing mild misalignment of the vertebrae, revealed no disc herniation or central spinal canal stenosis.

19

(Tr. at 842.)  The ALJ's findings are also consistent with the medical assessment of ability to do work related activities completed by Dr. Villareal (Tr. at 607-09), as well as the results of the physical examination conducted at the request of the Commissioner by Dr. Headrick.  (Tr. at 574-75.)

Neither party takes issue with the ALJ's characterization of the vocational testimony, nor with the conclusions that he derives from that testimony.  In the ALJ's most recent decision, he states:

> The Administrative Law Judge asked vocational expert Susan Lyon, whether jobs exist in the national economy for an individual of the claimant's age, education, past relevant work experience and residual functional capacity as determined.  The vocational expert testified that assuming the hypothetical individual's specific work restrictions, she is capable of making a vocational adjustment to other work.  The vocational expert testified that given all of these factors the claimant could work as security monitor (2,100), order clerk (5,300), reception clerk (6,200) and timekeeper (2,200).  The vocational expert verified that the above listed jobs and their incidents in the region generally conform to their description in the Dictionary of Occupational Titles.

(Tr. at 480.)

In reviewing the transcript of that hearing, I note that Sue Lyon did in fact testify as a vocational expert.  However, her entire colloquy with the ALJ is as follows:

ALJ:   Counsel, any questions of the vocational expert as to her qualifications?

ATTY: No, Your Honor.

BY ADMINISTRATIVE LAW JUDGE:

Q      Ma'am, have you reviewed the exhibits in the file?

A      Yes.

Q      Have you conducted or are you familiar with various surveys of businesses and industries of this region as to the jobs and occupations that exist in the region?

A      Yes.

Q Define the region for the record if you would please.

A The lower two-thirds of Michigan.

Q Do you have any questions of the Claimant as to her past work?

A Don't believe I do.

Q You have provided for the court – it's incorporated in the record as Exhibit 12E – a vocational analysis.  Based upon the testimony here today, are there any changes necessary to that document?

A No.

ALJ: Counsel, she's yours.  That's all I wanted from her.

(Tr. at 867-68.)

The vocational analysis to which Ms. Lyon refers (Tr. at 513) contains only a listing of Plaintiff's prior work and Ms. Lyon's assessment of the exertional level of those jobs.  As a result, at the most recent hearing, the ALJ never actually asked this VE any hypothetical questions, nor did he receive any opinions from her as to Plaintiff's residual functional capacity.  However, as noted earlier, ALJ Musseman presided over both of the administrative hearings conducted on Plaintiff's claims.  In the earlier hearing held February 11, 1998, Anne Tremblay testified as a VE. She characterized Plaintiff's prior work and responded to a series of hypothetical questions from the ALJ.  (Tr. at 444-45.)  Ms. Tremblay identified a series of jobs consistent with the hypothetical conditions articulated by the ALJ, which the ALJ accurately recites in his most recent decision. While troubled by the misidentification of the VE who testified at the most recent hearing, in light of the medical evidence previously described, I conclude that ALJ Musseman's findings are consistent with the opinions of the vocational experts who testified before him in the hearings on Plaintiff's claims and, more importantly, with the objective medical findings contained in the medical records, in particular, findings and assessments of Drs. Villareal and Headrick.  *See Sias*

*v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 481 (6th Cir. 1988); *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  I further suggest that the ALJ's findings are consistent with the willingness to undertake work activity expressed by Plaintiff to Dr. Forrer.  (Tr. at 571.)

After review of the record, I therefore conclude that the decision of ALJ Musseman, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Mullen*, 800 F.2d at 545, as the decision is supported by substantial evidence.

## III.   REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n. of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail

with the objections, and shall address specifically, and in the same order raised, each issue

contained within the objections.


                                           s/ *Charles E Binder*
                                        CHARLES E. BINDER
Dated: July 29, 2005                    United States Magistrate Judge




                            **CERTIFICATION**

       I hereby certify that this Report and Recommendation was electronically filed this date,
electronically served on James A. Brunson and Victor L. Galea, Sr., and served in the traditional manner
on Honorable David M. Lawson.


Dated:  July 29, 2005                   By     s/Mary E. Dobbick
                                        Secretary to Magistrate Judge Binder